PAUL STUEFER ET AL., APPELLANTS, V. WEST POINT MILL-
ING COMPANY, APPELLEE.

FILED NOVEMBER 16, 1910.   No. 16,100.

1. Waters: MAINTENANCE OF DAM: OVERFLOWING OF LAND: EVIDENCE:
   INJUNCTION.   In order to justify the issuance of an injunction to
   restrain the owners of a milldam from maintaining the dam
   and from increasing its height and thus permitting water to
   overflow the plaintiffs' land, the evidence of wrongful acts on the
   part of the defendant must clearly preponderate.   If it is doubt-
   ful whether the height of the dam has been the cause of the
   injury or whether the damage has resulted from some other
   cause an injunction will be denied.

2. ——: ——: ——: ——.   Evidence examined, and *held*
   that the allegations of the petition have not been sustained by a
   preponderance of the proof.

APPEAL from the district court for Cuming county:
GUY T. GRAVES, JUDGE. *Affirmed.*

*T. M. Franse* and *A. R. Oleson,* for appellants.

*P. M. Moodie* and *H. C. Brome, contra.*

LETTON, J.

The purpose of this action is to enjoin the maintenance
of a milldam and embankments in the Elkhorn river, to
restrain the defendant from diverting the waters of the
river, and from maintaining or increasing in height the
dam, dikes, and embankments so as to allow the waters to
overflow plaintiffs' lands.

The allegations of the petition, much abridged, are as
follows:   That the several plaintiffs are the owners of
separate tracts of land in Cuming county, Nebraska, ad-
jacent to and drained by the Elkhorn river; that the nat-
ural fall of the stream as it passes through the land and
for several miles up and down the stream is very slight;
that the subsoil is wholly sand, so that when the flow of
the water in the river is obstructed it percolates into the

plaintiffs' lands to such an extent that the lands become sour and wholly unfit for use; that about the year 1875 a dam five feet in height was constructed across the river without authority of law or without the plaintiffs' consent, but that, as so constructed, it did not damage the plaintiffs' lands; that during the last five years the defendant and its predecessor has carelessly and negligently allowed the bed of the river above the dam to fill with silt and refuse so that the bed of the river has been raised a number of feet, and has raised the dam and filled in the river at that point until the dam is eight feet higher than originally built; that, in addition to raising the height of the dam, the defendant has caused embankments and dikes to be constructed along the banks of the river to the height of three feet extending to a long distance above the dam; that by these acts the waters in the river were obstructed and interfered with so as to overflow and submerge these lands and render them valueless for cultivation and pasture; that defendant threatens to build the dam and embankments higher; that the waters flow over the low lands to another outlet below the dam, and the river is forming and will form a new channel over plaintiffs' lands; that the overflow has destroyed growing trees, grass, vegetation and crops, and that there is no adequate remedy at law.

The defendant pleads that the dam has been maintained at the same point ever since the year 1870 at the same height and in the same condition as now for the purpose of furnishing power with which to run a flouring mill, and since 1886 to pump water for the city of West Point; that the lands which are now overflowed have been continuously overflowed since 1870; that in 1904 the dam was washed out and soon afterwards reconstructed at a cost to defendant of between $5,000 and $7,000; that the plaintiffs knew that the dam would be useless and worthless unless it could be reconstructed and maintained at its present height, but, notwithstanding such knowledge, they permitted and encouraged defendant to expend a

large sum of money in such reconstruction without objection or protest. It further denies all the facts in the petition not admitted in the answer. The reply is a general denial.

A large amount of testimony was taken and the cause submitted to the district court, which found that the milldam had not been built higher during the past five years, or at any time, so as to cause the lands to be overflowed to a greater extent than they have been for more than ten years next before the commencement of the action; found, further, that the lands have been overflowed to a greater extent in the past five years than prior thereto; found generally for the defendant and rendered judgment accordingly. From this judgment the plaintiffs appealed, and the case is now here for trial *de novo* upon the evidence produced before the district court.

It appears that in 1867 a special act of the legislature of the territory of Nebraska was passed (laws 1867, p. 99) authorizing certain persons to erect a milldam "across the Elkhorn river, in the northeast quarter of section twenty-seven, township number twenty-two, north of range number six east of the sixth principal meridian, in Cuming county, Nebraska Territory." No dam was ever built at that point, but in 1870 a flour mill and dam were erected in another portion of section 27, the dam being the one complained of. There is no evidence to indicate that *ad quod damnum* proceedings were ever had, or that any damages were ever ascertained or paid to the owners of the land affected by the construction of the dam, so that whatever right the defendant may have to overflow the lands belonging to the plaintiffs has been acquired by adverse user since 1870, and not by express grant or condemnation. The appellants complain that the findings of fact made by the court are contrary to the law and the facts, and they insist that the great weight of the evidence sustains the allegations of the petition and entitle appellants to the decree prayed. This raises a very simple question, but one which requires a consideration of all the testimony in the record.

The defendant insists at the outset that the plaintiffs have a complete and adequate remedy at law, and therefore are not entitled in any event to the relief prayed for. In the view we take of the evidence, it is unnecessary to consider this point, but, if the allegations of the petition had been established, we doubt that adequate relief could have been afforded except by the interposition of a court of equity.

Before proceeding to a consideration of the evidence, it is well to premise that, in order to be entitled to relief in this case, it was incumbent upon the plaintiffs to prove, not only that their lands had been overflowed, but that the flooding of the property was had and caused by the raising of the height of the dam or embankments to a height greater than the defendant's rights by prescription warranted.

The first witness called for the plaintiffs was Mr. Heller, the county surveyor. He identified the situation of the plaintiffs' lands with reference to the river and dam, and produced certain maps and profiles, which were introduced in evidence, showing the meanderings of the river, the level of the water for several miles above and below the dam, and the height of the dam. He testifies that at the time he made the measurements in 1906 it was 9.68 inches from the surface of the water immediately above the dam to the surface of the still water immediately below. On cross-examination he testified that the elevation of the water in the mill-race and the elevation of the water above the dam was practically the same; that the levels were taken when the wheels were still, probably 25 feet back of where the water dips down to go over the dam; that on February 8, 1908, he made another measurement, and this measurement makes the dam 6 or 8 inches lower than the other; that the quantity of water going over the dam varies, and that if the river rose 2 or 3 inches it would affect the measurement. The witness further testified that, at the time he measured, the water above the dam at a low place ran into and through

Wisner lake into the river again below the dam, and that it is now flowing there, and has been doing so for a number of years; that the embankment at the low place is broken, and that this low place was formerly the bed of the river. He testifies that from 1867 to 1872 he lived near this locality; that he saw the Elkhorn river out of its banks before the West Point dam was built, and also after the dam was out; that he was there in the spring of 1881; that in 1881 he remembers seeing the waters all over the bottom; that the water was out of its banks at Wisner, 15 miles above West Point, last spring, and that this was not occasioned by the dam. He was also asked this question: "Q. Is it a fact that very often, without reference to dams at all in the Elkhorn river, in the spring of the year in times of high water the Elkhorn river goes out of its banks? A. Yes, sir. Q. And that the class of lands that the plaintiffs own is generally flooded at those times and on those occasions whether it is near the dam or not? A. Yes. The years we have exceptionally high water it is." The witness further testified that plaintiffs' land "is rather low, bottom lands. It is land that has been traversed by the Elkhorn river as time has passed on, and those parts of the land that I have mentioned, it has all been once used for the bed of the river which high water has shifted further and further, and it is what we call 'drift land.' It is full of little knolls and depressions, and, when the river gets so that two bends come together, it cuts off and it would form a new channel, and the lands that I have mentioned are of that kind of soil—sandy soil. It is a very productive soil, provided it is not overflowed. Of course, when the water becomes high it is all inlaid with sand, and it becomes very wet and becomes miry, while in the dry season, of course, it is very productive soil and produces very good corn." That Wisner lake gathers any surface water falling upon the territory west of it, and that the water of the lake which does not evaporate or sink into the soil runs into the river a mile or so below the dam; that still farther

above the dam there is a lake called McCarren's lake which is also a permanent lake. There was water in it when the witness first came to the country, and there has been water there ever since. It is fed from the river in times of high water, and the overflow from it runs into Wisner lake. He further testified that the water in Mc-Carren's lake is now, and has been for the last two or three years, four or five feet higher than it used to be.

The plaintiffs themselves were witnesses. Their testimony substantially is that from 1892 to 1902 their lands were not damaged by high water; that in May, 1903, a flood covered the bottom lands, but the dam went out and relieved it; that in 1904, 1905, and 1906 their lands were again flooded; that in 1903 the flood came by the low place into Wisner lake; that in 1904 it came from the river; that, when the water comes from the river through McCarren's lake to Wisner lake, it takes a higher stage of water than otherwise; that their land is low and sandy and requires draining into the river, and that during the last five years it has not drained, but that the water has percolated the subsoil and made the land sour and unproductive; that prior to 1903 they raised fair crops, but now it can only be used for pasture; and that large trees growing near the river have died in the last five years. Mr. Stuefer says: "I think they died from water standing round them, or seepage water." Formerly the mill people kept up banks at low places along the river where the water would run out when the river rose into the lakes and low places, but of late years they have neglected this. Their evidence further describes specifically the appearance of the land during the several floods, how the waters reached the lands from the river, and the specific damage caused. As to the raising of the dam they testify substantially as follows:

Mr. Nolan: After the dam was repaired in 1904 the witness saw it. They had extended and widened it. In 1902 he told Mr. Benedict, who was in charge of the West Point mill, that they had raised the dam and the back water had injured his hay; that Benedict said first that they had not

raised the dam, and then admitted that they had raised it, but not sufficient to flood his lands, and that they would fix the depressions; that when he talked to Benedict he could tell from the changed appearance of the dam that it had been raised, but he did not notice any dikes or embankments above the dam. On cross-examination he could not say that in 1903 they had raised the place where the water came down to the wheel; that he did not see his place in 1904. In 1905 he went up the river after the water subsided, and he noticed flood marks on the grass and ground as far as Pilger, about 22 or 23 miles from West Point; that up to the time he talked to Benedict he had not noticed any water coming from McCarren's lake on his land; that there was a low place between McCarren's lake and Wisner's lake through which the water might come in at times of floods, and Mr. Benedict agreed that he would close this up, and he did so; that there was another low place where the water came from the river into Wisner lake which Benedict agreed to fill and did fill, but it washed out.

Mr. Paul Stuefer: He sees the dam from 10 to 12 times during the year, and sees the river above the dam almost every day. He cannot tell how much the dam has been raised, but thinks it was raised continuously ever since it was built, about 3 or 4 feet in all. That in 1903 he said to Mr. Benedict after the washout: "If you replace the dam you will damage our lands, especially my land, and if you raise it any higher than it used to be you will also damage it more." That they rebuilt the dam and raised that portion of it across the river from 10 to 12 inches. When they found that the bank was tearing away on the west side, they put in sand and brush and made those low places higher than the bank of the river.

Mr. Wisner: The mill-race filled with sand, and they had to raise the dam to get the water in. Mr. Neligh did not have the dam so high. The new company raised it. Cross-examination: Mr. Neligh banked up where the water comes into the lake. The new people didn't keep the

dike up. Benedict promised to do this, but did not do so. The dam has been raised in the last 20 years probably a foot.

Mr. Henry Schinstock: The land was flooded in June, 1905. It is on account of the dam; did not have fall enough to allow it to go down fast enough; drowned out about 15 acres of oats, and drowned out again the same year; looked at the dam last when it looked like it had been raised. It is pretty near as high as the bank of the river. Before it was raised it must have been five feet lower than the bank. Cross-examination: I never measured it at any time; do not know whether the flume has been raised or lowered; have known of the dam for over 20 years.

Mr. Herman Kaup: Moved on his land five years next March. The first year he was there the water came once out of the river into the lake. The last year it came out probably a dozen times, and last summer three times, when there was any high water. McCarren's lake is higher than it was five years ago, perhaps three feet. Every time it rained, after that, the water always became higher, and then they kept adding onto the dam. "Q. How do you know they kept on building the dam higher? A. We could see it on the trees and also on my neighbor's trees. * * * Q. You may state whether those trees five years ago were standing in the water? A. Yes, sir."

Several other witnesses for the plaintiffs testified that they had worked upon the dam in 1903, and subsequently, and that brush, straw, sod and dirt had been added to it so as to raise it in height and width almost every year. Other witnesses testified they had dug out silt and sand from the flume both above and below the wheel pit, and still others described the effect of the floods upon the land and crops. If this evidence were not assailed we think it might support the allegations of the petition, but upon a consideration of the testimony produced upon the part of the defendant, which we will now consider, its effect is materially weakened.

For the defendant, Mr. A. C. Ludwig testifies that he is

a carpenter and contractor; that in 1901 he reconstructed the headgate and flume for the West Point Milling Company; that the dam was left just as it was, the inlet was not changed nor the outlet, and no change was made in the height of the side walls of the flume, but another partition was run between the two old walls, making three walls instead of two. Cross-examination: This narrowed the flume about three feet. That is the only change that was made.

A. M. Ludwig worked for his brother repairing the flume. The new sills were framed to fit under the old one. The old floor was not changed, and the top and bottom joists were not disturbed. The new partition extended about 40 feet down the flume.

Roy N. Towl, a civil engineer, residing in Omaha, in August, 1907, made a map of the locality (exhibit 8) and measured the height of the dam. The difference between the water below the dam and above was 8.23 feet. About a foot of water was going over the dam at the time. The water appeared to be at a normal stage. He also took the level of Wisner lake and McCarren's lake. The water in Wisner lake was lower than the surface of the river, and there was water flowing into it not directly connected with the river, but coming from the direction of the river. He also took the level of McCarren's lake. The water in this lake was approximately 1.2 feet higher than the water of the river. There was a dike between the lake and river, but if the dike had been removed water would not have flowed from the river to the lake at that stage of water. The water in McCarren's lake was about 6 feet higher than the water in Wisner lake. Between McCarren's lake and the river the elevation of the ground was such that the water would have to rise two feet in the river before it could run into the lake. If the dam was raised it would necessarily raise the water in the flume.

Carl Zuehr: Has worked around the mill as repairman 23 years; the dam is no higher now than it was 23 years ago, and the flume has not been raised or lowered during

that time. The dam is a brush dam, and it settles more or
less every year. He has put a little brush on it every year.
Part of the dam has gone out four or five times since he
worked there. In 1903, after the west side of the dam
washed out, the dam was rebuilt wider and a little higher
than before on account of the settling, but the next year it
was lower than the old part. While the dam was being
built teams drove over it, but the water then was running
through the brush. He saw the Ludwigs repair the flume.
They used the old floor and put in a partition. The tail-
race has not been changed in any way. Twenty-five years
ago when he first came there he saw the water running
over the whole bottom. In 1886 or 1887 they had as high
water in the river as they have had recently. Cross-exam-
ination: Never measured the dam. Could tell without
making measurement whether the dam was higher by the
height of the water at the wheel-house. He put brush and
sod and dirt on the dam to repair it. He washed the silt
out of the flume nearly every week. Filling up part of the
race with silt stops the water and does not give quite the
power. Have worked putting in dikes and embankments
along the west side of the river, built them level with the
other ground in the old river bed to keep the water from
going in on Wisner's land; also to keep the water off
Stuefer's land.

William Zobel: Worked for the milling company 21
years. Have helped repair the dam when it needed it. We
raised the dam so as to give the same height of water in
the wheel-house. Cross-examination: Don't know whether
it is any higher now than it was two years ago. We fix
the dam every year. In the fall we put on brush and sod,
and in the summer when the water is low we make it a
little higher with planks and dirt.

Nicholas Reuss: Worked for milling company 22 years.
Have helped repair the dam every time it has been re-
paired. So far as I know the dam is just the same now
as it was 20 years ago. Cross-examination: Never meas-
ured the dam. Helped to put brush upon the top of it
every time, and sod and dirt.

W. F. S. Neligh: Prior to 1892 lived continuously at West Point 25 years. Son of John D. Neligh. Am familiar with the dam. My father was in charge of the construction of the mill and the labor that was performed there. The dam has been maintained for 40 years at its approximate height of to-day. In the earlier years I have gone all over that country in a boat. We started at the railroad track and could go clear across the bottoms. That was sometime in 1870 or 1880. McCarren's lake and Wisner lake have been there ever since I have known the country. We have had unusually high water for a period of the last ten years. In 1905 during the flood I went to McCarren's lake and made an examination to see where the water was getting into that lake. It was approximtely four miles above the dam. There was a stream probably 300 feet wide and a foot deep in the center. We came by boat across that land through McCarren's lake. The country south of town was overflowed to a considerable extent at that time. The dam settles every year, and the top has to be dressed every year. They usually do the work in the fall, put the brush on, then when it freezes over cover it with straw and then with sod. The repairs are usually made when the river is low. They determine the height of the repairs according to the flume. They build so as to make the top of the dam practically level and even across. If they should raise the dam it would have the effect to raise the water in the flume. Cross-examination: Never took any measurement of the height of the dam. Have seen the water in the spring of the year all over the bottoms from McCarren's lake to the Horse Shoe (Wisner's lake) practically solid, with one or two knolls in Wisner's pasture above water. The highest water is usually in May. I have seen water over the greater portion of these bottoms several times, as a rule in May and June; I think in 1881, and in 1885, 1888, and perhaps in 1889.

Harry Winger: Is manager of the milling company. Has lived at West Point since 1886. Has been employed

by the milling company since 1905. Since then has maintained about 8 feet of head water in the wheel-house, in low water about 7½ feet. The head of the water varies, especially during very low water. The photographs in evidence were taken in the spring of 1906. Part of the dam went out in 1906. Cross-examination: In 1905 and 1906 we could not run the mill in the spring on account of high water. Never measured the dam, but measured the water in wheel-house. If the water above the dam raised, it would raise the water in the wheel-house just that much. The water in the flume and above the dam is practically at the same level.

Mr. Benedict: Was employed from 1900 to 1905 as manager of the milling company. Repairs were made every year on account of the settlement of the dam. In the spring of 1903 the water washed around the dam. Filling the gap and repairing the dam cost about $5,000. The cost of repairing the dam during the years he was manager was from $1,000 to $1,500 a year. The dam was not raised during these years. The flume was repaired, but no change was made in its height, and the mill-race has not been raised or lowered. Cross-examination: Had no experience with dams before he came to West Point. The books will show the cost of repairs for those years. Am not a civil engineer. Don't know the height of the dam, but could tell by measuring the water in the flume. Always aimed to keep the water at the same height in the flume when the river was normal. The flume has a wooden floor, and there is no silt or mud in the flume. Think now the cost of repairs was from $600 to $1,200 a year. In 1903 the water cut around the dam, making a break about 160 feet wide and 3 feet deep; in other words, the river was changed, so that the water ran around the dam. The $5,000 was expended in forcing the water over the main dam. Denies promising Nolan not to raise the dam any more, but that he would fix up the banks of the river.

F. Koch: Is acquainted with the land belonging to plaintiffs. Has lived here 40 years. Recollects the water

coming on these pieces of land in the earlier years he lived here. "Q. State whether in 1868, or about there, there was any flooding of these lands. A. Well, there was every once in a while. Of course I don't remember the years, but one year especially I remember, that was in 1873, the June water." Testifies that one year he went twice up over the land owned by the Schinstocks and Paul Stuefer with a boat; also went over Mr. Wisner's land. Went as far as Mr. Kaup's and Mr. Nolan's and Mr. Wisner's with a boat. In 1873 he went up as far as Mr. Wisner's land, and came down the channel of the river over the dam. In 1881 or 1882 it was flooded about the same; not quite so high as in 1873. In these years the land was partly flooded. When there is high water that whole Elkhorn bottom is partly flooded.

John Elsinger: Has lived in West Point about 35 years. Has been familiar with all of the plaintiffs' land for about 20 years. The water was very high on these lands in 1880; every foot of Mr. Wisner's land was under water; also Mr. Nolan's. Had pretty high water in 1881 and 1882. All of this land was pretty much under water at that time because I have taken a boat and gone clean over to the McCarren place; could go over Wisner's, Nolan's and McCarren's land, Mr. Kaup now owns. In 1885 was the last time it flooded that country so much. It might have been 1886 or 1884. The low parts of that land the water does not have to be very high to flow over it. In the spring of 1888 it was pretty much all covered with water. Of course, there were knolls in it that stuck out. Cross-examination: Sometimes ice gorging in the river would have a good deal to do with throwing the water out on the land. It would stay on it from a week to three weeks, but would drain some. At that time there was none of that land that we thought fit to farm. The first man who farmed it was in 1892 or 1893. I haven't paid much attention to it between 1892 and 1902.

Andrew Rosewater: A civil engineer of 40 years' experience. If the water-wheels are not in operation, there

53

would be no difference in the level of the water above the
dam and the level of the water in the flume. If the dam
were removed entirely, the immediate effect would be to
lower the water level for quite a distance up the river, but
eventually the cutting of the banks and deposit of sand
bars caused by the increased velocity would cause bends
in the stream and equalize the flow, and the result would
be to reduce the flow to the same as that of the river
generally.

The remaining evidence is in the form of maps, plats
and photographs. The photographs, taken in 1906, exhibit
the process of repairing a break in the dam by piling in
brush, and clearly show the loose texture until the brush
has settled. While we do not consider that levels taken
by a surveyor are always of equal weight with testimony
as to the actual level of water as shown by water marks,
yet evidence otherwise lacking is furnished by the plat
showing the actual levels of the low portions of the plain-
tiffs' lands, of the surface of the water in McCarren's
lake, in Wisner lake, and in the river. It seems that the
plaintiffs' land would be better protected if the dike or
obstruction in the low places where the water from the
river flows into Wisner lake were repaired instead of
demolished. This is what they say they requested of the
manager of the milling company. In this action they
pray for the removal of all dikes.

After considering all the evidence, giving due regard
to the interest of the plaintiffs on the one side, and the
influence which the fact of being employed by the defend-
ant may possibly have on the testimony of its employees
on the other, we are convinced that the plaintiffs, while
undoubtedly being subject to greater damage from water
in the past five years than in the ten-year period from
1892 to 1902, have not established by a preponderance of
the evidence that the flooding has been caused by an in-
crease in the height of the dam. No doubt, as they testify,
the height has apparently been increased several times,
but this is explained by the nature of a brush dam. The

Stuefer v. West Point Milling Co.

positive evidence of the men who have worked on the dam for 20 years is that it is at the same relative height now that it has always been. The flume has been unchanged, and the testimony is uncontradicted that the height of water there in ordinary stages is the same as ever. Perhaps the circumstance that heavy floods occurred during the earlier years, that for a cycle or period of years they ceased, and then occurred again, may be explained by the fact, which is a matter of history, that about the time of early settlement, rains were abundant, that for a portion of the time from 1892 to 1902 droughts were frequent and crops were light in this locality, while in these latter years rainfall has been more profuse and crops correspondingly more bountiful.

Upon the whole case, we cannot say that we are satisfied that any act of the defendant within the last ten years has caused the damages complained of. The district court with the added advantage of seeing and hearing the witnesses so found, and we can find no fault with its conclusion.

The judgment of the district court is

AFFIRMED.

REESE, C. J., dissenting.

It is with regret that I find myself unable to agree to the opinion of the majority of the court in this case, and that this dissent becomes necessary. I think the proof clearly shows that the dam as at present maintained is higher than is permitted, either by the act of 1867 (territorial session laws 1867, p. 99; act approved February 6, 1867) or by user to the extent that the statute of limitations will afford complete justification. I furthermore think that it is sufficiently shown that the land of plaintiffs has been overflowed to a much greater extent than before the increase of the height of defendant's dam, and that a large tract of land which was valuable before is now rendered practically worthless. I do not believe that defendant has the right to construct its dam higher than

is permitted by law or prior usage in order that when it settles it may be of the proper height. It may require a month or a year to complete the settling process, and during which time plaintiffs' land is liable to overflow by reason of the increased construction. I admit that the proof as to the exact increase of the height of the dam is not as clear as might be, and that upon another trial that question could be finally put at rest and justice be administered between the parties, and therefore favor remanding the cause in order that further evidence may be produced if the parties can do so.

FAWCETT, J., concurs.